## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI

SORKIN'S RX LTD. d/b/a CAREMED
PHARMACEUTICAL SERVICES,

                Plaintiff,

      v.

EXPRESS SCRIPTS, INC.,               Case No. 4:15-cv-114
    One Express Way
    St. Louis, MO 63121
    Attention:  Vice President, Provider Strategy     **JURY TRIAL DEMANDED**
    and Contracting; General Counsel and
    General Counsel for Network Contracting
    and Management

    c/o CSC- Lawyers Incorporating Service
    Company,
    Registered Agent
    221 Bolivar Street
    Jefferson City, MO 65101

and

MEDCO HEALTH SERVICES, INC.
    100 Parsons Pond Drive
    Franklin Lakes, NJ 07417

    c/o CSC – Lawyers Incorporating Service
    Company,
    Registered Agent
    221 Bolivar Street
    Jefferson City, MO 65101

                Defendants.

## <u>VERIFIED COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF</u>

Plaintiff Sorkin's Rx Ltd. d/b/a CareMed Pharmaceutical Services ("CareMed"), by its

attorneys, for its Verified Complaint for Injunctive and Other Relief against defendants Express

Scripts, Inc. and Medco Health Services, Inc. collectively ("ESI"), states as follows:

## <u>INTRODUCTION</u>

1.      This is an action for violation of state and federal statutes governing anti-competitive behavior and healthcare regulations, as well as breach of contract and unjust enrichment.  CareMed seeks preliminary and permanent injunctive relief and money damages.

2.      CareMed is service-oriented pharmacy located in New York that provides excellent pharmaceutical care to over 7,800 patients and has access to numerous Limited Distribution Drugs;  provides a comprehensive disease management program for the benefit of patients; coordinates with nurses for in-home training on self-injectable medications; provides ancillary supplies free of charge to patients; maintains a state of the art clean room; coordinates and secures same day deliveries for patients; has clinical pharmacists on call 24/7; and proactively contacts patients on the same day that prescriptions are received.

3.      ESI is a Pharmacy Benefit Manager (PBM) which together with two other PBM's administers nearly every prescription drug insurance plan in the U.S.   PBM's were created by managed care organizations in the 1980s to apply managed care principles, such as provider networks and patient co-pays, to the drug benefit portion of health care plans. Through growth in the 1990s, PBM's "emerged as the national standard for the administration of prescription drug insurance in the United States."  Through a period of consolidations in the last decade, the PBM industry has become dominated by three large companies. The three largest PBM's - Medco, Caremark and Express Scripts - administer 80% of insured prescriptions and 90% of insured mail order prescriptions. Each of these companies has annual revenues exceeding $15 billion.

4.      The three largest PBM's, two of which - ESI and Medco - are linked to and are parties to this action, manage drug benefits for over 200 million Americans.  This amounts to 95% of Americans with prescription drug coverage.  By engaging in anti-competitive and other

unlawful behavior, ESI and Medco became two of the three largest PBM's controlling all aspects of prescription drug benefit plans, including creating formularies of preferred medicines, negotiating with drug manufacturers for discounts and rebates, negotiating with pharmacies to establish retail networks for dispensing drugs, and establishing automated processes for determining (often called "adjudicating") coverage eligibility at the point of sale. ESI also owns and operates its own mail order pharmacy to fill prescriptions directly and takes affirmative steps to direct the flow of prescriptions to its own pharmacy to increase market share, slow down the costs and eliminate competition. Pharmacies have no choice in the market but to acquiesce in ESI's demands or be effectively shut out of the market.

5.     On May 1, 2007, CareMed executed an ESI – Medco Pharmacy Provider Agreement ("Agreement"), marked as Exhibit 1, to permit CareMed to become a participant in ESI's – Medco pharmacy network.  CareMed had no bargaining role in the agreement. The agreement was a take it or leave it contract of adhesion. CareMed currently serves approximately 7,800 patients in the State of New York under the Agreement who generated a total of approximately $69 million in fees for the period January 1, 2014 through September 30, 2014. The Agreement was renewed on September 24, 2014 and this agreement was also a contract of adhesion.  A true and accurate copy of the renewal is marked as Exhibit "2."  CareMed has and continues to perform all of its obligations under the Agreement.

6.     On October 6, 2014, CareMed made a business choice to settle a civil action with the State of New York and the federal government.  A true and accurate copy of the settlement is marked as Exhibit "3.  The underlying claims related to alleged false claims during the time period 2009 – 2012.   CareMed denied having intentionally engaged in any conduct that would justify false claims act liability, but resolved the matter to avoid the cost and diversion of

3

business attention that years of litigation would cause. CareMed made arrangements to notify ESI – Medco of the resolution.

7.      On October 24, 2014, ESI – Medco notified CareMed that it was terminating the Agreement because CareMed had "plead [sic] guilty to fraud".  A true and accurate copy of this correspondence is marked as Exhibit "4."  ESI – Medco's stated basis for termination of the Agreement is false.  There was and is no lawful basis for ESI to terminate CareMed.  ESI's termination is another step towards further monopolization of the market, a continued violation of statutes and/or regulations concerning the process of terminating a health care provider, and is a breach of the Agreement between ESI –Medco and CareMed. The conduct is unlawful, threatens patient health, threatens the very existence of CareMed, and deprives it of the benefits it reasonably expected and is entitled to receive.

## THE PARTIES

8.      Plaintiff CareMed is a corporation organized and existing under the laws of the State of New York and is authorized to do business in the State of New York.  CareMed maintains a registered office at 1981 Marcus Ave., Suite 225, Lake Success, New York 11042.

9.      Upon information and belief, defendant Express Scripts, Inc. ("ESI" and Medco Health Services, Inc. collectively with CareMed, the "Parties") is a corporation organized and existing under the laws of the State of Delaware and is authorized to do business in the State of Missouri.  ESI maintains a place of business at One Express Way, HQ2N03, St. Louis, Missouri 63121, and has an address for the service of process at 221 Bolivar Street, Jefferson City, Missouri 65101.  ESI is a resident of Missouri, is doing business in Missouri, and has substantial contacts with Missouri.

10.     Upon information and belief, defendant Medco Health Services, Inc. is a

4

corporation with its principal place of business located at 100 Parsons Pond Drive, Franklin Lakes, NJ 07417.

11.     In April 2012, ESI acquired Medco for over $29.1 billion and the merger created the largest PBM in the United States holding approximately 45 percent of the market share.

## JURISDICTION AND VENUE

12.     This Court has original jurisdiction over this action under 28 U.S.C. § 1332 because the parties are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.  This Court also has supplementary jurisdiction pursuant to 28 U.S.C. § 1367.

13.     This Court has personal jurisdiction over ESI because ESI is a resident of Missouri and has its principal place of business in the Eastern District of Missouri.

14.     This Court has personal jurisdiction over Medco Health Services, Inc. because ESI is a resident of Missouri, has its principal place of business in the Eastern District of Missouri and acts as the agent for multiple purposes for Medco Health Services, Inc.  Based upon the completed merger in 2012, Medco is, like ESI, a wholly-owned subsidiary of St. Louis based Express Scripts Holding Co.

15.     Venue is proper in this District under 28 U.S.C. § 1391, because ESI resides in this judicial district, and ESI is a resident of Missouri.  Venue is also proper in this District because ESI has breached and has threatened to breach contractual duties to CareMed in this District and has performed contracts substantially connected to this District.

## BACKGROUND

16.     CareMed is a retail specialty pharmacy providing services to high-risk patients in need of medications that are extraordinarily expensive and require some degree of special

8965417 _1 PERSON.1255

handling. These services include the filling of prescriptions, delivery of medications, facilitating coverage of the medication by insurance companies, and assisting patients with the research of and application for co-payment assistance programs.

17.     ESI and Medco are pharmacy benefit managers ("PBM") who, *inter alia*, administer and manage prescription drug programs for health maintenance organizations and insurance companies, which cover many of the specialty medications CareMed dispenses to its clients.

18.     On or about May 1, 2007, the parties entered into a Provider Agreement pursuant to which ESI agreed to compensate CareMed for the fulfillment of various pharmacy activities, including the filling of prescriptions and distribution of specialty medications to patients suffering from serious, and often fatal, diseases. <u>See</u> Ex. 1. This contract was a contract of adhesion.

19.     The parties, through contiguous addendums, amendments, and renewals, all of which were non-negotiated contracts compelled by the ESI – Medco market position, have maintained this contractual relationship to date. The most recent and operational Provider Agreement is dated September 24, 2014 ("Agreement"). <u>See</u> Ex. 2.

20.     The Agreement provides ESI – Medco with the following four ways to properly terminate its relationship with CareMed:

a.  First, the Agreement allows either of the parties to inform the other party on 90 days' notice that it is choosing to not renew the Agreement that otherwise automatically renews at the end of the term. This provision is inapplicable.

b.  Second, the Agreement provides that ESI can terminate the Agreement without cause on 30 days' notice.

6

c.  Third, the Agreement provides that if either party breaches the Agreement, the other party can terminate after the expiration of a 30 day cure period if the breaching party does not cure its breach within that 30 day period.

d.  Finally, ESI can terminate the Agreement immediately under certain circumstances, such as when the provider ceases to be properly licensed, which is not the case here. Ex. 1.

21.  The Agreement further provides that ESI "shall provide to [CareMed] a written explanation of the reasons for the proposed contract termination, other than nonrenewal, and an opportunity for a review as required by state law," which includes the right to a hearing panel comprised of three persons, at least one of whom shall be a clinical peer in the same discipline and the same or similar specialty as CareMed. The right to a review under the Agreement also includes the right to receive in writing the hearing panel's decision and a minimum of 30 days following receipt of the hearing panel's decision before termination is effective. Ex. 1.

## The Civil Action

22.  On or about June 4, 2012, a Relator filed a complaint under the qui tam provisions of the federal False Claims Act, 31 U.S.C. §§ 3730 (b) - (h) and the New York False Claims Act, N.Y. State Fin. Law § 190(2). Prior to being aware a qui tam complaint had been filed and in response to a general government inquiry, CareMed undertook to investigate and reevaluate the operations and compliance aspects of its business after commencement of the qui tam action ("Action").

23.  Throughout the following two years, CareMed not only complied entirely with the requests for information and production of documents by governmental agencies, but instituted its own internal evaluation of its operations and compliance procedures, reporting issues to the government where appropriate.

7

24.     Following a thorough investigation by the Federal and State governments, no criminal charge was brought and no plea entered. Rather, CareMed entered into a Stipulation and Order of Settlement with the United States and the State of New York, respectively ("Settlement"), on or about October 6, 2014.  See Ex. 3.

25.     As part of the Settlement, CareMed made certain limited admissions and accepted responsibility for certain actions during the period from January 1, 2009 through December 31, 2012.  See Ex. 3.

26.     The Settlement did not revoke CareMed's licenses permitting it to participate in the Medicaid and Medicare programs.  Ex. 3.  Rather, CareMed worked with the Office of Inspector General ("OIG") to enter into a Corporate Integrity Agreement ("CIA") and agreed to the appointment of an Independent Review Organization ("IRO").  A copy of the CIA is marked as Exhibit 5.

27.     The agreement contemplated payment over time and that CareMed would remain in business and continue in federally funded programs, Medicare and Medicaid.  Accordingly, CareMed entered into the CIA on or about December 1, 2014.  Under the CIA, CareMed agreed: (1) to have in place a compliance officer and a compliance committee; (2) to have its board of directors be responsible for the review and oversight of all the company's compliance matters; (3) to provide management certifications of compliance with the requirements of federal healthcare programs; (4) to maintain a written code of ethics and written standards and policies; (5) to maintain a comprehensive board and employee training program; (6) to retain an Independent Review Organization; (7) to conduct risk assessments and internal reviews; (8) to implement a disclosure program; (9) to screen and remove employees that are ineligible to participate in federal healthcare programs; (10) to notify OIG of certain reportable events,

government investigations, and legal proceedings; (11) to develop policies and procedures for the return of overpayments received in federal healthcare programs; and (12) to provide periodic reports to OIG on the status of CareMed's compliance activities.  Ex. 5.

28.     Also under the CIA, CareMed and its officers and employees remain eligible to participate in Medicare, Medicaid, and other federal health care programs; and in exchange for CareMed's performance of its obligations under the settlement, the federal government has agreed not to seek the exclusion of any of those persons from participation in those programs. Ex. 5.

## CareMed's History and Compliance Programs

29.     CareMed was formed in August 2006 and led by Muhammed Tyyeb, who passed away on September 6, 2012 after a long illness.  Muhammed Tyyeb was the sole owner of CareMed until shortly before his death.  Just days after he passed away, the government contacted CareMed for the first time about conduct occurring in the time period of 2009-2012.

30.     When CareMed began on August 1, 2006 as a specialty pharmacy, it filled a real need for doctors and patients – due to a customer-service oriented approach and a commitment to assisting patients locate and utilize co-payment assistance programs – which resulted in a rapid growth.  Doctors were overwhelmed with paper work and patients were in need of rapid processing of their prescriptions and funding to help with their often cost-prohibitive co-payment obligations.  The high growth rate of CareMed, resulting from addressing these needs, together with its initial high employee turnover rate, exposed weaknesses and monitoring flaws in CareMed processes.

31.     During this time, CareMed experienced a relatively unstable and highly mobile population of clinical care coordinators. Upon starting at CareMed, every clinical care

coordinator had previously worked at, and thus previously had been trained by, similarly situated specialty and/or retail pharmacies. While CareMed required these individuals to be re-trained in ethics, compliance, and their job responsibilities, the turnover rate became increasingly problematic.

32.     Between January 2009 and December 2012, the turnover rate fluctuated dramatically from 15% to 40%. This turnover was the function of the highly mobile population and the strict compliance standards of CareMed. The year 2009 resulted in approximately 15 to 25 employee terminations for a variety of reasons, mobility and performance related, and in 2012 the number reached a staggering 50 to 60.

33.     Also during this time, employee growth was rising at a high rate. In January 2009, CareMed employees totaled between 10 and 20. However, by December 2012, the total number of employees jumped to approximately 70. The systems then in place were not sufficiently mature and robust to fully address the problems created by the high turnover rate and steady influx of new hires.

34.     Shortly after the initial inquiry, CareMed implemented a new governance structure. The company was then in the hands of the Estate of Muhammed Tyyeb and was led by Nuaman Tyyeb, President, and Moby Kazmi, CEO. CareMed was sure to not take any action to interfere with the investigation by the government.

35.     Once CareMed became aware of the Qui Tam the company fully cooperated and honored the mutual confidentiality. Accordingly, it waited until shortly after the inquiry to terminate the person who functioned as the compliance officer. CareMed also hired a new Intake Supervisor to oversee the employees who frequently deal with the PBMs and third-party payors, as well as a new Senior Vice President of Pharmacy Operations to oversee the management and

operation of the company overall.

36.    As part of their training, CareMed's clinical care coordinators – the employees responsible for submitting claims to PBMs and third-party payors – are provided a protocol for submitting claims, including documenting all information received from a doctor's office and submitted to PBMs and payors.

37.    On March 12, 2014, CareMed implemented a call audit program, which predates the Settlement. Compliance team members, isolated from other employees, listen to and audit both inbound and outbound live telephone calls made by CareMed employees, while also monitoring the employees' computer screens in real time. During the first eight months of operation the "overhear" project was monitored by outside counsel.

38.    The Compliance Director oversees an audit team which conducts audits in high-risk areas as determined by the Compliance Committee. The audits are conducted on an on-going basis and generally address the areas of billing practices, guidelines and accuracy of information provided to PBMs and payors.

39.    Other measures CareMed implemented include monthly meetings of the Compliance Committee consisting of supervisory staff and senior management, an informal "open door" policy by the Compliance Department, and adoption of a self-disclosure protocol. In addition, all compliance issues and inquiries are document by the chief compliance officer via a Compliance Investigation Form and provide anonymous reporting through blind emails and 800 phone number.

**ESI's First Breach of Contract**

40.    On or about October 28, 2014, CareMed received a letter ("First Termination Letter") from ESI notifying CareMed that the Agreement would be terminated the following

11

week on November 7, 2014.  Ex. 4.

41.    The First Termination Letter purported to terminate the Agreement on the following grounds, neither of which is true: (1) "the owner of [CareMed] plead [sic] guilty to fraud in the Southern District of New York;" and (2) CareMed "did not notify [ESI] of this action or the guilty plea."  Ex. 4.

42.    The termination was based on the government's press release and the mistaken premise that CareMed had pleaded guilty to fraud.  In fact, CareMed settled a civil action ("Action") with the Federal and New York State governments – there was never a criminal indictment, and thus never a plea.

43.    The press release, which formed the basis for ESI's initial determination, was issued  after the Settlement.  The press release was never seen before its publication, or agreed to, by CareMed.  More importantly, the allegations in the press release are in CareMed's view, untrue and are inconsistent with the admissions required by the government in the Settlement and the CIA.

44.    As part of the Settlement, CareMed made the following admissions:

a.  Part D plans employ utilization management practices that sometimes require providers to obtain "prior authorization" before covering certain drugs. With respect to several specialty drugs sold by [CareMed], Part D plans require the submission of clinical information regarding the Medicare beneficiary prior to approving coverage. Part D plans often require this clinical information to be provided directly by representatives of the prescribing physician's office.

b.  When contacting insurance companies to obtain prior authorization for the coverage of specialty drugs prescribed to Medicare beneficiaries, some representatives of [CareMed] falsely stated that they were calling from the prescribing physician's office. In some instances, [CareMed] representatives responded to questions seeking clinical information based on their understanding of the prior authorization criteria for the particular drug, instead of obtaining the patient's actual clinical information from the prescribing physician and conveying that information.

c.  [CareMed] failed to adequately oversee and train staff responsible for the prior authorization process.

12

d. [CareMed] had inadequate procedures and auditing processes in place to ensure that some claims submitted to certain third-party payors for Rituxan and Procrit, including claims for payment to Part D plans and Medicaid, were reversed when necessary or credited to the Part D plan or Medicaid, after Procrit and Rituxan were returned to the pharmacy and restocked or not delivered to and/or received by the beneficiary.  Ex. 3.

45.     The admissions refer to *some instances* of conduct by *some representatives*, and that *oversight and training was not adequate* to avoid or intercept the conduct.  That is the full extent of the admissions.  There is no admission of, nor was there, a pattern of conduct or approval by the company.  Most importantly, there is no admission of fraud or intent to deceive by CareMed.  The admissions acknowledge discreet instances and the actions of rogue employees occurring over a multiyear time frame, and do not reflect the actions of CareMed as a whole. Ex. 3.

46.     Throughout its extensive investigation, the government did not identify a single instance when CareMed submitted a claim to any PBM or other payor which was not based upon a legitimate prescription for a patient in need of the medication prescribed.  CareMed, too, conducted an internal investigation and was unable to identify any such instance.

47.     Furthermore, the time period covered by the Action and Settlement and the admissions therein is January 1, 2009 through December 31, 2012.  During this time period, CareMed had different ownership and faced challenges as a new specialty pharmacy that it no longer faces under new ownership and as CareMed's once-rapid growth has stabilized.

48.     ESI's assertion in the First Termination Letter that CareMed did not notify ESI of the Action or the Settlement is disingenuous at best.

49.     The Settlement and the Action were sealed until October 9, 2014.  Prior to October 10, 2014, CareMed had not seen the complaint filed in the Action.

50.     On October 9, 2014, CareMed and its counsel called ESI to notify it of the Action and Settlement and to advise ESI of the many changes in CareMed's management structure and compliance programs.

51.     CareMed followed up this telephone conversation with a letter, dated October 14, 2014 ("October 14 Letter") to ESI's counsel providing additional information on the Action and Settlement. A copy of the October 14 Letter is marked as Exhibit 6.

52.     Upon information and belief, ESI's purpose in terminating the Agreement is to divert nearly 7,800 patients from CareMed to ESI's own specialty pharmacy and thereby generate an additional $100 million in annual revenues for ESI as part of its continuing monopolization of the market. Indeed, ESI brazenly stated that patient's in need should simply go to ESI's pharmacy.

53.     Upon receipt of the First Termination Letter, CareMed immediately contacted ESI, in part to clarify the terms of the Settlement and correct misstatements of fact in ESI's letter. ESI agreed, on or about October 28, 2014, to not terminate the Agreement pending ongoing conversations with CareMed and its counsel.

54.     Nevertheless and without warning, ESI sent to CareMed a November 14, 2014 letter ("Second Termination Letter"), received November 17, 2014, notifying CareMed that the Agreement would be terminated the following day, November 18, 2014. A copy of this correspondence is marked as Exhibit 7.

55.     The Second Termination Letter repudiated the rationale for termination set forth in the First Termination Letter. Instead, ESI offered new fabricated justifications for immediately terminating CareMed. Specifically, ESI alleged that CareMed did not abide "by key provisions in Provider's contract(s) with Express Scripts, including but not limited to Section

14

2.4 of the Network Provider Manual (requiring all information submitted to Express Scripts to be "accurate and complete"), Section 6.2 of the Network Provider Manual (prohibiting Provider from "knowingly making a false claim"), and Section 9.6 (agreeing that Provider will comply with the terms of the False Claims Act). In addition, Provider's admissions establish that Provider does not meet Express Scripts' standard terms and conditions for participation with Express Scripts. Accordingly, Express Scripts has determined that Provider's termination will go forward in accordance with Appendix B of the Network Provider Manual." ESI did not identify a single instance in which "all information submitted to Express Scripts" was not "accurate and complete"

56.    CareMed, through its counsel, again contacted ESI to discuss the basis for termination. Following a conversation between CareMed's counsel and ESI, ESI agreed to postpone termination until November 26, 2014, and thereafter until December 1, 2014, pending receipt of a letter from CareMed addressing the termination.

57.    On December 1, 2014, CareMed detailed correspondence and supporting documentation itemizing the flaws of ESI's termination as well as providing direct evidence of the basis for the settlement with the federal government; history of CareMed ownership and expansion; corrective actions taken by CareMed; corporate governance of CareMed; the instituted Compliance Program; and the Corporate Integrity Agreement. A copy of this correspondence is marked as Exhibit "8."

58.    The new provisions upon which ESI is purporting to terminate the Agreement are completely pre-textual and without basis. Rather, ESI is illegitimately using the Action and Settlement as justification for terminating the Agreement in order to redirect thousands of patients from CareMed to ESI's own specialty pharmacy.

59.     In terminating the Agreement, ESI is acting contrary to the United States and the State of New York, each of which possessed the power to put CareMed out of business and bar it from participation in Medicare, Medicaid, and other federal healthcare programs.  However, no one from the United States (including the U.S. Department of Health and Human Services) or the State of New York ever expressed any desire or intent to do so.  The Settlement and CIA contemplate that CareMed will be permitted to serve its patients and their doctors, remain in business and continue participation in all federal healthcare programs.

60.     ESI's termination of the Agreement is a breach of the implied duty of good faith and fair dealing.  Upon information and belief, ESI is using the Action and Settlement as a pretext for termination in order to direct from CareMed to ESI approximately 7,800 patients and approximately $100 million in revenue associated with them, without regard for those patients' desires or interests in contravention of state and federal anti- trust laws.

## ESI's Selective Enforcement of the Agreement

61.     Upon information and belief, ESI is selectively enforcing the provisions of the Agreement, which they invoke for termination against CareMed, treating CareMed unequally and unfairly in comparison to similarly situated providers.

62.     Upon information and belief, ESI is choosing not to enforce termination provisions of similar agreements, despite knowing that providers other than CareMed have engaged in conduct upon which termination could be based.

63.     ESI's selective enforcement against CareMed is even more problematic considering the non-material nature of the alleged breaches.  The conduct underlying the admissions in the Settlement, even taken at face value, did not lead to a single payment by ESI that it would not have made if CareMed was in technical compliance with all possible rules, regulations, and contractual provisions.

16

64.     Neither New York State nor the Federal government has identified, in their extensive investigation, nor has CareMed admitted to a single submission to ESI, false statements of fact.  The State and Federal governments' findings and CareMed's admissions do not specify any particular submissions to ESI.

65.     Despite the transparent disclosure of CareMed and repeated attempts to educate ESI on its improper understanding of CareMed leading to the illegal attempted termination, ESI continues to threaten termination effective January 15, 2015 and has denied any request to stay the termination, rescind the termination, allow assignment of clients to an in-network pharmacy (other than ESI) or to permit a qualified operator to manage CareMed's account.

## Irreparable Injury to CareMed

66.     ESI's wrongful termination of the Agreement will result in irreparable harm by putting at risk the lives of the many patients that CareMed serves and preventing CareMed from providing a smooth and seamless transition for these patients.

67.     CareMed provides services for thousands of patients who depend upon their medications, coverage for which is supposed to be provided by ESI pursuant to the Agreement.  These patients, many of whom are elderly and have the added stress of work and an illness, rely on CareMed to fill their prescriptions on a monthly basis.  The premature termination of the Agreement will severely disrupt the continuity of care these patients are entitled to and currently do receive.

68.     ESI's attempts to divert approximately 7,800 patients from using CareMed's services to using ESI's own specialty pharmacy will cause CareMed to lose, overnight, approximately $100 million in annual revenues.  CareMed will be unable to sustain its costs under this drastic and immediate loss, likely causing CareMed – an independent specialty pharmacy providing valuable services to patients and doctors alike – to close its doors and

17

terminate the employment of approximately 75 individuals affecting numerous families and the community.

69.     Furthermore, CareMed's reputation in the industry of pharmacy benefit managers ("PBM") and others will be permanently damaged.  CareMed will have to report the termination of its contract with ESI and such a termination will have a domino effect with other PBM's, accrediting agencies, and industry players leading to the destruction of CareMed's business for this separate reason.

70.     CareMed has no adequate remedy at law which could compensate it for the impending injury that ESI's actions will cause if they are allowed to go forward.

## ANTITRUST ALLEGATIONS

71.     Defendant ESI conspired and engaged in an concerted effort to unreasonably restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, et seq., to end all coverage for compound prescription medications and eliminate CareMed and other independent compounding pharmacies as competitors in the Relevant Market.

### Trade and Interstate Commerce

72.     The provision and sale of the pharmaceutical services and products, and insurance coverage for such services and products related to CareMed, are each in, and affect, interstate commerce.

73.     Many of the activities of ESI in administering and processing the prescription drug benefits for employers, unions, and health plans in every state are in the regular, continuous, and substantial flow of interstate commerce, and have a substantial effect upon interstate commerce.

18

**The Relevant Market**

74.     The relevant service market affected by ESI's conduct is pharmacy services that are reimbursed by insurance, including, but not limited to, the compounding, filling, and dispensing of prescription medications.  The relevant product market affected by ESI's conduct is prescription drugs that are reimbursed by insurance, including, but not limited to, compounded prescription drugs.

75.     The relevant geographic market for activity that affects CareMed is the Eastern United States, including, but not limited to, New York.

76.     The unlawful conspiracy of ESI has had the effect of unreasonably restraining, suppressing, and eliminating competition in the provision of pharmacy services and the dispensation of prescription drugs covered by insurance in all markets in which CareMed did and could operate in interstate commerce.

**Action by ESI to Unreasonably Restrain Trade in the Relevant Market**

77.     Upon information and belief, ESI is an active member of the Pharmaceutical Care Management Association ("PCMA"), "the national association representing America's pharmacy benefit managers (PBMs)."     (See    http://www.pcmanet.org/about-pcma/about-pcma; http://www.pcmanet.org/about/aboutpcma/members.)

78.     Executives from ESI serve on the PCMA's Board of Directors: Jon Roberts (President, CVS/Caremark & Executive Vice President, CVS Health) is the Chairman of the PCMA Board of Directors and Eric Elliot (President & Chief Executive Officer, Prime Therapeutics), Tim Wicks (Chief Executive Officer, OptumRx), George Paz (Chairman & Chief Executive Officer, Express Scripts) are all members of the PCMA Board of Directors.  (See http://www.pcmanet.org/about-pcma/board-of-directors.)

79. The PCMA's website makes clear that the PCMA facilitates communication and collaboration among leaders in the PBM industry to "shape the industry's direction" and "explore collaborative solutions" to industry issues, including for example, "specialty pharmacy".

80. The PCMA hosts various meetings and summits at which PCMA members convene to discuss industry issues and strategies for addressing those issues.

81. Upon information and belief, ESI joined together in approximately 2013 – through the PCMA and otherwise – to study the market for compound prescription medications and compound medicine prescribing trends, and to collectively determine how to best eradicate coverage for compound medications in 2014.

82. Upon information and belief, after surreptitiously gathering information about physician prescribing trends and compound pharmacy dispensing practices, ESI attempted to exclude independent compounding pharmacies from the Relevant Market by employing various, anti-competitive means, including, but not limited to: intimidating physicians who prescribed compound medications and the patients who take them; effectuating insurmountable obstacles for pharmacies to receive reimbursement for compound prescriptions; eliminating coverage for all compound medications by denying coverage for the ingredients used to prepare them; terminating CareMed and other independent compounding pharmacies from their respective networks without cause; and putting independent compounding pharmacies out of business.

83. The only plausible explanation for the conduct of ESI in excluding independent compounding pharmacies from the Relevant Market is that it is the result of a conspiracy or agreement to jointly boycott CareMed and independent compounding pharmacies.

8965417 _1 PERSON.1255

84.     If ESI acted unilaterally to exclude compound prescription medications from its formulary or otherwise raise fees to account for the purported costs associated with compounded medicines, the services and formularies made available to plan sponsors by that individual PBM would be less competitive compared to those of ostensibly competing PBM's.

## **Monopolization of the Relevant Market**

85.     Upon information and belief, Defendant ESI conspired to engage in an attempt to monopolize the Relevant Market and unreasonably restrain Plaintiff CareMed from participating in the Relevant Market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, in order to eliminate Plaintiff CareMed from the Relevant Market.

86.     Defendant ESI is a PBM which together with two other PBM's administer nearly every prescription drug insurance plan in the U.S.  Defendant ESI, together with two other large companies, dominates the PBM industry. Together, they manage drug benefits for over 200 million Americans – 95% of Americans with prescription drug coverage.  By engaging in anti-competitive and other unlawful behavior, ESI and Medco became two of the largest PBM's controlling all aspects of a prescription drug benefit plan, including creating formularies or preferred medicines, negotiating with drug manufacturers for discounts and rebates, negotiating with pharmacies to establish retail networks for dispensing drugs, and establishing automated processes for determining coverage eligibility at the point of sale.

87.     As a result of Defendant ESI's all-encompassing behavior, pharmacies effectively have no choice in the market but to acquiesce on Defendant ESI's demands or be shut out of the market.

88.     Upon information and belief, Defendant ESI's purpose in terminating the Agreement is to divert nearly 7,800 patients from CareMed to Defendant ESI's own specialty

pharmacy and thereby generate an additional $100 million in annual revenue for Defendant ESI furthering its continuing monopolization of the market. Indeed, Defendant ESI brazenly stated that patients in need should simply go to ESI's pharmacy. This is clearly an unlawful attempt by ESI to monopolize the Relevant Market.

## Attempted Monopolization of the Relevant Market

89. In terminating the Agreement, Defendant ESI is acting contrary to the intent of the United States and the State of New York, each of which possessed the power to put CareMed out of business and bar it from participation in Medicare, Medicaid, and other federal healthcare programs. However, no one from the United States (including the U.S. Department of Health and Human Services) or the State of New York ever expressed any desire or intent to do so. The Settlement and CIA contemplate that CareMed will be permitted to serve its patients and their doctors, remain in business and continue participation in all federal healthcare programs. Contrary to this, Defendant ESI unreasonably, and against the express provisions of the agreement with CareMed, terminated CareMed in an effort to retain CareMed patients and monopolize control over the Relevant Market.

90. Upon information and belief, Defendant ESI is selectively enforcing the provisions of the Agreement, which they invoke as cause for termination against CareMed.

91. Defendant ESI's termination was without proper notice and based upon incorrect facts. This is an intentional act done with the purpose of diverting approximately 7,800 patients from CareMed and the associated revenue in connection therewith to Defendant ESI.

92. By deliberately ignoring the actual allegations contained in the settlement and therefore, reaching its own contrary conclusions, Defendant ESI is attempting to fish for a reason to push CareMed out of the relevant market and thus control both its patients and more of the

relevant market.

**COUNT 1**
**VIOLATION OF SECTION ONE OF THE SHERMAN ACT, 15 U.S.C. § 1**

93.     CareMed incorporates by reference as though fully set forth herein paragraphs 1 through 92 of the Complaint.

94.     ESI has engaged in unlawful conduct, combination, or conspiracy to unreasonably restrain trade and commerce in the Relevant Market in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

95.     ESI's refusal to deal with and/or boycott CareMed and independent compounding pharmacies constitutes a *per se* unreasonable restraint on trade in the Relevant Market under Section 1 of the Sherman Act, 15 U.S.C. § 1, because inter alia:

a.   It is a horizontal agreement between ESI and other PBM's and operate at the same level of the prescription drug benefit market;

b.   It excludes CareMed and other independent compounding pharmacies from obtaining access to reimbursements from health insurance and plans for prescription medications – a supply, facility, or market necessary for CareMed and other independent compounding pharmacies to compete in the pharmaceutical services and prescription drug market;

c.   ESI possesses a dominant position in the prescription drug benefit market – PBM's manage 95% of all prescription drugs covered by insurance and ESI dominates the PBM market in the United States with a market share of more than 80% - and because of this dominant position, ESI is able to and in fact does exercise control over and/or substantially affect the purchase and sale of pharmaceutical services and prescription drugs in the Relevant Market; and

23

  d. The concerted conduct of ESI is not justifiable by plausible arguments that it was intended to enhance overall efficiently and make the Relevant Market more competitive; in fact, said conduct has destroyed competition in the Relevant Market, as described more fully herein.

96. As a direct and proximate result of ESI's conduct, CareMed has been and will continue to be irreparably injured and financially damaged in its business and property in that, among other things, CareMed has suffered and will continue to suffer significant lost revenue and net profits from the substantial decrease in reimbursements from compound medicines covered by health insurance policies and plans.

97. The damages CareMed has sustained from its exclusion as a competitor from the Relevant Market constitutes an injury to the type the Sherman Act was designed to prevent and was directly caused by that which makes ESI's conduct unlawful under the Sherman Act.

98. Plaintiff has no adequate remedy at law from its injury and damages alleged herein.

WHEREFORE, CareMed hereby respectfully requests that judgment be entered in its favor and against Defendant, Express Scripts, Inc. and Medco and that this Court enter an Order:

  a. Preliminarily and permanently enjoining Express Scripts, Inc. from engaging in anticompetitive and illegal conduct in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, as more fully described herein;

  b. Awarding CareMed compensatory damages in an amount to be determined at trial;

  c. Awarding CareMed three times actual damages against Express Scripts, Inc. for its volitions of Section 1 of the Sherman Act;

  d. Awarding CareMed interest, attorney's fees, and costs incurred herein; and

  e. Awarding such other and further relief as this Court deems just and proper under the circumstances.

## COUNT II
## VIOLATION OF SECTION TWO OF THE SHERMAN ACT, 15 U.S.C. § 2

99.     CareMed incorporates by reference as though fully set forth herein paragraphs 1 through 98 of the Complaint.

100.     ESI has unlawfully targeted pharmacies that have the potential to compete with ESI and thereby overtake the Relevant Market.  ESI has willfully engaged, and is engaging, in a course of conduct, including unreasonable exclusionary remedies, in order to obtain a monopoly in the Relevant Market and there is a dangerous probability that, unless restrained, it will succeed in violation of Section 2 of the Sherman Act, 15. U.S.C § 2.  ESI has acted with specific intent to monopolize and to prevent effective competition in the Relevant Market.

101.     As a direct and proximate result of ESI's conduct, CareMed has been and will continue to be irreparably injured and financially damaged in its business and property in that, among other things, CareMed has suffered and will continue to suffer significant lost revenue and net profits from the substantial decrease in reimbursements from compound medicines covered by health insurance policies and plans.

102.     The damages CareMed has sustained from its exclusion as a competitor from the Relevant Market constitutes an injury to the type the Sherman Act was designed to prevent and was directly caused by that which makes ESI's conduct unlawful under the Sherman Act.

103.     Plaintiff has no adequate remedy at law from its injury and damages alleged herein.

WHEREFORE, CareMed hereby respectfully requests that judgment be entered in its favor and against Defendant, Express Scripts, Inc. and Medco and that this Court enter an Order:

> a.     Preliminarily and permanently enjoining Express Scripts, Inc. from engaging in anticompetitive and illegal conduct in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, as more fully described herein;

8965417 _1 PERSON.1255

b. Awarding CareMed compensatory damages in an amount to be determined at trial;

c. Awarding CareMed three times actual damages against Express Scripts, Inc. for its volitions of Section 2 of the Sherman Act;

d. Awarding CareMed interest, attorney's fees, and costs incurred herein; and

e. Awarding such other and further relief as this Court deems just and proper under the circumstances.

## COUNT III
## ERISA 502(a)(3), 29 U.S.C. 1132(a)(3)

104. CareMed incorporates by reference as though fully set forth herein paragraphs 1 through 103 of the Complaint.

105. CareMed, as an ERISA beneficiary, brings this court pursuant to ERISA 502(a)(3), 29 U.S.C. 1132(a)(3), to enjoin ESI's acts and/or practices that violate 29 U.S.C. 1104 and/or the terms of the applicable ERISA Plans, and to obtain appropriate other equitable relief to redress such violations or to enforce such provisions.

106. As an ERISA beneficiary, ESI was at all relevant times obligated to discharge its duties with respect to ERISA Plans:

a. solely in the interests of the participants and beneficiaries;

b. for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plans; and

c. with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character with like aims.

107. ESI breached its fiduciary duties by *inter alia:*

a. ending coverage for certain compound ingredients under the ERISA Plans for

the sole purpose of further reducing ESI's spending and expenses, and without considering the health and well-being of ERISA Plan participants and beneficiaries;

b. violating the ERISA claims procedures in its adjudication of claims submitted by CareMed; and

c. knowingly disseminating false and misleading information regarding the safety and status of compound medications under federal and state regulations to ERISA Plan participants and beneficiaries and to physicians administering care to such participants and beneficiaries.

108. CareMed, an ERISA beneficiary, has suffered and will continue to suffer immediate and irreparable harm as a direct result of ESI's breach of its fiduciary duties because CareMed is a compounding pharmacy and derives a substantial percentage of its revenue from reimbursements from ESI for compounded prescription medications.

109. There is no adequate remedy at law for Plaintiff's injuries alleged herein.

WHEREFORE, Plaintiff CareMed hereby respectfully requests that judgment be entered in its favor and against Defendant, ESI, and that this Court enter an Order:

a. declaring that ESI's activities identified in this Court constitute a violations of fiduciary duties under 29 U.S.C. 1104;
b. preliminarily and permanently enjoin Defendant ESI from eliminating from coverage those chemicals, drugs and other ingredients used by CareMed and other compounding pharmacies in the preparation of compound medications prescribed by licensed physicians for their patients who have prescription drug benefit coverage administered by Defendant ESI pursuant to an ERISA Plan and which had heretofore been covered by such plans;
c. awarding Plaintiff CareMed interest, attorneys' fees, and costs incurred herein; and
d. awarding such other and further relief as this Court deems just and proper under the circumstances.

## COUNT IV
## VIOLATION OF NEW YORK ANTITRUST LAW SECTION 340 OF THE NEW YORK GENERAL BUSINESS LAW

110.    CareMed incorporates by reference as though fully set forth herein paragraphs 1 through 109 of the Complaint.

111.    New York General Business Law Section 340.1 provides:

> Every contract, agreement, arrangement or combination whereby A monopoly in the conduct of any business, trade or commerce or in the furnishing of any service in this state, is or may be established or maintained, or whereby competition or the free exercise of any activity in the conduct of any business, trade or commerce or of in the furnishing of any service in this state is or may be restrained or whereby for the purpose of establishing or maintaining any such monopoly or unlawful interfering with free exercise of any activity in the conduct of any business, trade or commerce or in the furnishing of any service in this state any business, trade or commerce or furnishing of any service is or may be restrained, is hereby declared to be against public policy, illegal and void.

112.    Thus, Section 340 of the New York's General Business Law makes illegal and void any contract, agreement, arrangement or combination that restrains competition of any business for the purposes of establishing or maintaining such monopoly or unlawful interference in the conduct of any business.

113.    ESI is a PBM, which together with two other PBM's administer nearly every prescription drug insurance plan in the U.S.  Defendant ESI, together with two other large companies, dominates the PBM industry. Together, they manage drug benefits for over 200 million Americans – 95% of Americans with prescription drug coverage.

114.    ESI has, against express provisions of their agreement with CareMed, terminated CareMed from its network in order to obtain unlawful control over CareMed patients.  As such, ESI has obtained more control over the Relevant Market, over which ESI already has majority control.

28

115. Indeed, ESI brazenly stated that the patient's in need should simply go to ESI's pharmacy. ESI's actions have had an adverse effect on competition as a whole and, through its unlawful behavior, has forced CareMed out of the Relevant Market for its own benefit.

116. ESI is liable to CareMed for the damages that CareMed has suffered as a result of ESI's actions, the amount of such damages to be determined at trial, plus attorney's fees. Such damages are subject to trebling pursuant to General Business Law § 340.

WHEREFORE, CareMed hereby respectfully requests that judgment be entered in its favor and against Defendant, Express Scripts, Inc. and that this Court enter and Order:

    a. Preliminarily and permanently enjoining Defendant Express Scripts, Inc. from engaging in anticompetitive and illegal conduct in violation of the Donnelly Act, § 340 of the New York General Business Law, as more fully described herein;
    b. Awarding CareMed compensatory damages in an amount to be determined at trial;
    c. Awarding CareMed three times actual damages against Defendant Express Scripts, Inc. for its violations of the Donnelly Act;
    d. Awarding CareMed its interest, attorney's fees, and costs incurred herein; and
    e. Awarding such other relief as this Court deems just and proper under the circumstances.

## COUNT V
## BREACH OF CONTRACT

117. CareMed incorporates by reference as though fully set forth herein paragraphs 1 through 116 of the Complaint.

118. CareMed and ESI have a long-standing business relationship, governed by the Agreement.

119. ESI's termination of the Agreement without proper notice and on the basis of incorrect facts is a breach of the Agreement.

120. ESI's termination of the Agreement in order to divert approximately 7,800 patients from CareMed and the associated revenue in connection therewith to ESI is a breach of

29

8965417 _1 PERSON.1255

the implied duty of good faith and fair dealing.

121. CareMed has fully performed all of its material obligations under the Agreement.

122. As a direct and proximate result of ESI's breach, CareMed has and will be damaged in excess of $1,000,000.

WHEREFORE, CareMed hereby respectfully requests that judgment be entered in its favor and against Defendant, Express Scripts, Inc. and that this Court enter and Order:

a. Awarding CareMed compensatory damages in an amount to be determined at trial;
b. Awarding CareMed damages against Defendant Express Scripts,
c. Awarding CareMed its interest, attorney's fees, and costs incurred herein; and
d. Awarding such other relief as this Court deems just and proper under the circumstances.

## COUNT VI
## BREACH OF IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING

123. CareMed incorporates by reference as though fully set forth herein paragraphs 1 through 122 of the Complaint.

124. ESI has an obligation to carry out the Agreement in good faith and deal fairly with CareMed.

125. Upon information and belief, ESI is selectively enforcing the termination provisions against CareMed in order to divert approximately 7,800 patients and the revenue in connection therewith into ESI's own specialty pharmacy.

126. ESI is not acting in good faith, where it is using the Settlement as a pretext for selectively enforcing the termination provisions of the Agreement against CareMed.

127. ESI has not engaged in fair dealing with CareMed where CareMed informed ESI that its purported grounds for termination are factually inaccurate and where ESI promised to delay termination of the Agreement pending ongoing conversations with CareMed and,

nevertheless and without notice, purported to terminate the Agreement on one days' notice.

128.    As a direct and proximate result of ESI's breach of the implied duty of good faith and fair dealing, CareMed has and will be damaged in excess of $1,000,000.

WHEREFORE, CareMed hereby respectfully requests that judgment be entered in its favor and against Defendant, Express Scripts, Inc. and that this Court enter and Order:

   a.  Awarding CareMed compensatory damages in an amount to be determined at trial;
   b.  Awarding CareMed damages against Defendant Express Scripts,
   c.  Awarding CareMed its interest, attorney's fees, and costs incurred herein; and
   d.  Awarding such other relief as this Court deems just and proper under the circumstances.

## COUNT VII
## UNJUST ENRICHMENT

129.    CareMed incorporates by reference as though fully set forth herein paragraphs 1 through 128 of the Complaint.

130.    Upon information and belief, ESI is improperly terminating the Agreement in order to divert nearly 7,800 patients and the corresponding revenue from CareMed to ESI.

131.    CareMed has invested in these patient relationships, assisting the patients with locating and applying for copayment assistance programs, working with the patients' doctors to ensure timely delivery of medication to patients, and communicating with patients to build their trust and confidence.  ESI's attempts to poach CareMed's patients is self-serving and at the expense of CareMed.

132.    ESI is not entitled to or deserving of the business associated with these patients for whom CareMed has provided services and invested money and time over the course of several years.

133.    ESI's solicitation and diversion of CareMed's patient base into ESI's own specialty pharmacy for no legitimate business purpose constitutes a benefit conferred upon ESI

by CareMed.

134.	ESI has appreciated the benefit of the fact that it solicited and diverted CareMed's patient base into its own specialty pharmacy.

135.	It is inequitable for ESI to accept and retain the benefit conferred by the solicitation and diversion of CareMed's patient base into ESI's own specialty pharmacy without paying the value thereof in that the transfer of such patient base had no legitimate business purpose.

136.	As a result of ESI's actions, ESI will be unjustly enriched in excess of $100 million by the business CareMed has developed and which ESI seeks to divert to its own specialty pharmacy.

WHEREFORE, CareMed hereby respectfully requests that judgment be entered in its favor and against Defendant, Express Scripts, Inc. and that this Court enter and Order:

　　　a.	Awarding CareMed compensatory damages in an amount to be determined at trial;
　　　b.	Awarding CareMed damages against Defendant Express Scripts,
　　　c.	Awarding CareMed its interest, attorney's fees, and costs incurred herein; and
　　　d.	Awarding such other relief as this Court deems just and proper under the circumstances.

## COUNT VIII
## TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS BETWEEN CAREMED AND ITS CUSTOMER BASE

137.	CareMed incorporates by reference as though fully set forth herein paragraphs 1 through 136 of the Complaint.

138.	ESI had knowledge of the business relationships between CareMed and its patient base. ESI also had knowledge of CareMed's expectancy that it would maintain its business relationship with its patient base, and had knowledge of the fact that CareMed has invested substantial resources in developing and maintaining those relationships.

8965417 _1 PERSON.1255

139.    Despite having knowledge of these business relationships, ESI has tortuously interfered with such business relationships, without justification or excuse.

140.    Further, upon information and belief, ESI intends to further tortuously interfere with CareMed's contractual and business relationships, in a manner both willful and intentional, without justification or excuse.

141.    As a result of the actions of ESI, CareMed has been injured and faces irreparable injury.  CareMed is threatened with losing or has lost its business, income and/or goodwill.

WHEREFORE, CareMed hereby respectfully requests that judgment be entered in its favor and against Defendant, Express Scripts, Inc. and that this Court enter and Order:

a.  Awarding CareMed compensatory damages in an amount to be determined at trial;
b.  Awarding CareMed damages against Defendant Express Scripts,
c.  Awarding CareMed its interest, attorney's fees, and costs incurred herein; and
d.  Awarding such other relief as this Court deems just and proper under the circumstances.

## COUNT IX
## BREACH OF CONTRACT

142.    CareMed incorporates by reference as though fully set forth herein paragraphs 1 through 141 of the Complaint.

143.    CareMed and ESI have a long-standing business relationship, governed by the Agreement.

144.    The Agreement provides that ESI "shall provide to [CareMed] a written explanation of the reasons for the proposed contract termination, other than nonrenewal, and an opportunity for a review as required by state law," which includes the right to a hearing panel comprised of three persons, at least one of whom shall be a clinical peer in the same discipline and the same or similar specialty as CareMed.  The right to a review under the Agreement also

33

includes the right to receive in writing the hearing panel's decision and a minimum of 30 days following receipt of the hearing panel's decision before termination is effective.

145.   ESI has purported to terminate the contract without informing CareMed of its right to review and without affording CareMed the requisite opportunity for review of ESI's decision to terminate the Agreement.

146.   ESI has purported to terminate the Agreement without providing CareMed the opportunity to have a hearing panel review the decision to terminate, and without providing CareMed 30 days following receipt of the hearing panel's decision before effectuating the termination of the Agreement.

147.   ESI's termination of the Agreement without the requisite opportunity for review before a hearing panel, without the requisite written decision of the hearing panel, and without the requisite 30 days following receipt of the hearing panel's decision during which the termination is not yet effective pursuant to the Agreement is a breach of the Agreement.

148.   The Agreement also provides that ESI shall notify CareMed of any default under the contract; allow CareMed to cure any default; meet and confer regarding any dispute; and negotiate in Good Faith to resolve any discrepancy between the parties.

149.   ESI failed to notify CareMed of any default under the Agreement thereby negating CareMed the opportunity to cure said default.  That said, CareMed has been completely forthcoming about the repeated inconsistencies alleged by ESI regarding CareMed's operations. Despite this transparency, ESI continues to avoid any required meet and confer and Good Faith Negotiation to resolve ESI's unfounded and inaccurate allegations.

150.   CareMed has fully performed all of its material obligations under the Agreement.

151.   As a direct and proximate result of ESI's breach, CareMed has and will be

34

damaged in excess of $1,000,000.

WHEREFORE, CareMed hereby respectfully requests that judgment be entered in its

favor and against Defendant, Express Scripts, Inc. and that this Court enter an Order:

    a. Awarding CareMed compensatory damages in an amount to be determined at trial;
    b. Awarding CareMed damages against Defendant Express Scripts,
    c. Awarding CareMed its interest, attorney's fees, and costs incurred herein; and
    d. Awarding such other relief as this Court deems just and proper under the circumstances.

## COUNT X
## BREACH OF CONTRACT

152.    CareMed incorporates by reference as though fully set forth herein paragraphs 1

through 151 of the Complaint.

153.    ESI relies on terms of the Network Provider Manual, effective date February

2013, as a basis for termination of CareMed.

154.    CareMed and ESI executed the Agreement in 2007, years before the institution of

the Network Provider Manual.

155.    ESI has purported to terminate CareMed under the terms of the Network Provider

Manual.

156.    ESI's termination of CareMed under the Network Provider Manual is improper as

the Network Provider Manual was not in existence at the time that the terms of the relationship

between CareMed and ESI were negotiated.

157.    CareMed has fully performed all of its material obligations under the Agreement.

158.    As a direct and proximate result of ESI's breach, CareMed has and will be

damaged in excess of $1,000,000.

WHEREFORE, CareMed hereby respectfully requests that judgment be entered in its

favor and against Defendant, Express Scripts, Inc. and that this Court enter an Order:

    a. Awarding CareMed compensatory damages in an amount to be determined at trial;

    b. Awarding CareMed damages against Defendant Express Scripts,

    c. Awarding CareMed its interest, attorney's fees, and costs incurred herein; and

    d. Awarding such other relief as this Court deems just and proper under the circumstances.

## COUNT XI
## VIOLATION OF NEW YORK PUBLIC HEALTH LAW § 4406-d(2)

159. CareMed incorporates by reference as though fully set forth herein paragraphs 1 through 158 of the Complaint.

160. New York Public Health Law § 4406-d(2) ("PHL 4406-d") prohibits ESI from terminating the Agreement with CareMed, a health care professional under the statute, unless ESI provides CareMed with a written explanation of the reasons for the proposed contract termination and an opportunity for a review or hearing.

161. Pursuant to PHL 4406-d, ESI's notice of the proposed termination of the Agreement must include the reasons for the proposed action; notice that CareMed has the right to request a hearing or review before a panel; notice of no less than thirty days within which CareMed may request a hearing; and a time limit for a hearing date.

162. The hearing panel provided for in PHL 4406-d must be comprised of three persons, at least one of whom is a clinical peer in the same discipline and the same or similar specialty as CareMed.

163. Pursuant to PHL 4406-d, the hearing panel's decision must be provided in writing to CareMed, and if such decision is to terminate the Agreement, the termination must not be effective sooner than 30 days following CareMed's receipt of the decision.

164. ESI did not inform CareMed of its right to a hearing or review of ESI's purported

termination. ESI did not provide CareMed with the opportunity for review before a hearing panel. ESI did not provide the requisite 30 days following the hearing panel's decision before the purported termination may be effectuated.

165. As a result, ESI has violated, in several respects, PHL 4406-d.

WHEREFORE, CareMed hereby respectfully requests that judgment be entered in its favor and against Defendant, Express Scripts, Inc. and that this Court enter an Order:

a. Awarding CareMed compensatory damages in an amount to be determined at trial;
b. Awarding CareMed damages against Defendant Express Scripts,
c. Awarding CareMed its interest, attorney's fees, and costs incurred herein; and
d. Awarding such other relief as this Court deems just and proper under the circumstances.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Sorkin's Rx Ltd. d/b/a CareMed Pharmaceutical Services demands judgment against defendant as follows:

That ESI, along with any and all of their agents, employers, employees, attorneys and those persons in active concert or participation with them, be enjoined through a temporary restraining order, preliminary injunction, and permanent injunction:

a. From terminating the parties' contract;
b. From contacting CareMed's patients in an attempt to transition them away from CareMed into ESI's own specialty pharmacy;
c. From otherwise interfering with CareMed's business relationships with its patient base;
d. Such injunctive relief is required in order to prevent immediate and irreparable injury to CareMed, and CareMed has no adequate remedy at law to compensate it for the impending damage should Defendant not be so enjoined;
e. An award to CareMed of the damages it has suffered, including but not limited to lost profits, in an amount to be proven at trial;
f. An award to CareMed of attorneys' fees and the costs of this action;
g. An award to CareMed of compensatory and/or punitive damages for Defendant's tortious conduct;
h. An award to CareMed of applicable pre-judgment interest; and
i. An award to CareMed of all other legal and equitable relief to which CareMed is entitled.

Dated: January 14, 2015

Respectfully submitted,

_____ /s/ Edward L. Dowd, Jr. _____
Edward L. Dowd, Jr. (8341)
John D. Comerford (1443742)
DOWD BENNETT LLP
7733 Forsyth Blvd., Suite 1900
St. Louis, MO 63105
(314) 889-7300
edowd@dowdbennett.com
jcomerford@dowdbennett.com

Anthony J. Calamunci (*Pro Hac Vice Pending)*
ROETZEL & ANDRESS
20 South Clark Street, Suite 300
Chicago, IL 60603
(419) 254-5247
acamalmunci@ralaw.com

*Attorneys for Plaintiff Sorkin's Rx Ltd. d/b/a CareMed Pharmaceuticals*

8965417 _1 PERSON.1255