UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| SORKIN'S RX LTD. D/B/A CAREMED PHARMACEUTICAL SERVICES, | ) ) ) ) |
| Plaintiff, | ) No. 4:15-CV-114-JAR ) |
| v. | ) ) |
| EXPRESS SCRIPTS INC., et al., | ) ) |
| Defendants. | ) |

## MEMORANDUM AND ORDER

This matter is before the Court on Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction. (Doc. No. 5) The motion is fully briefed. Plaintiff Sorkin's Rx Ltd., d/b/a/ CareMed Pharmaceutical Services ("CareMed") brings this action for violation of state and federal statutes governing anticompetitive behavior and healthcare regulations, as well as breach of contract and unjust enrichment, against Defendants Express Scripts, Inc. and Medco Health Solutions, Inc. ("Express Scripts") after receiving notice from Express Scripts that it was terminating CareMed from its network of pharmacies. CareMed contends that if Express Scripts is allowed to terminate their Provider Agreement, CareMed will be put out of business. CareMed seeks a temporary restraining order and preliminary injunction preventing its termination from Express Scripts' pharmacy network.

### Background

CareMed is a retail specialty pharmacy providing services to high-risk patients, which include the filling of prescriptions, delivery of medications, facilitating coverage of the

medication by insurance companies, and assisting patients with the research of and application for co-payment assistance programs. (Compl. at ¶ 16) Express Scripts is a pharmacy benefit manager who, *inter alia*, administers and manages prescription drug programs for health maintenance organizations and insurance companies, which cover many of the specialty medications CareMed dispenses to its clients. (Id. at ¶ 17) CareMed is a member of Express Scripts' pharmacy provider network pursuant to a Provider Agreement and Provider Manual ("Agreement").

On or about October 28, 2014, CareMed received a letter from Express Scripts notifying it that the Agreement would be terminated based on the fact that CareMed's owner pled guilty to fraud and failed to notify Express Scripts of the plea in violation of Section 1.2 of the Provider Manual. (Doc. No. 13-4) At CareMed's request, Express Scripts agreed to extend the termination date to permit additional information to be submitted and reviewed regarding CareMed's settlement of a qui tam complaint filed under the federal False Claims Act, 31 U.S.C. §§ 3730 (b) - (h) and the New York False Claims Act, N.Y. State Fin. Law § 190(2). As part of the settlement entered into on October 9, 2014, CareMed admitted that certain of its employees made false statements to insurance companies when seeking prior authorizations during the period from January 1, 2009 through December 31, 2012.[1]

---

[1] CareMed made the following admissions:

> a. Part D plans employ utilization management practices that sometimes require providers to obtain "prior authorization" before covering certain drugs. With respect to several specialty drugs sold by [CareMed], Part D plans require the submission of clinical information regarding the Medicare beneficiary prior to approving coverage. Part D plans often require this clinical information to be provided directly by representatives of the prescribing physician's office.
> b. When contacting insurance companies to obtain prior authorization for the coverage of specialty drugs prescribed to Medicare beneficiaries, some representatives of [CareMed] falsely stated that they were calling from the prescribing physician's office. In some instances, [CareMed] representatives responded to questions seeking clinical information based on their understanding of the prior authorization criteria for the particular drug, instead of obtaining the

Express Scripts reviewed the additional information provided and, by letter dated November 14, 2014, notified CareMed that its termination would go forward on the grounds that CareMed did not abide "by key provisions in Provider's contract(s) with Express Scripts, including but not limited to Section 2.4 of the Network Provider Manual (requiring all information submitted to Express Scripts to be "accurate and complete"), Section 6.2 of the Network Provider Manual (prohibiting Provider from "knowingly making a false claim"), and Section 9.6 (agreeing that Provider will comply with the terms of the False Claims Act). In addition, Provider's admissions establish that Provider does not meet Express Scripts' standard terms and conditions for participation with Express Scripts." (Doc. No. 13-5)

Express Scripts postponed the termination twice more and, on December 22, 2014, finally notified CareMed that it would be terminated effective January 15, 2015. This action was filed on January 14, 2015, one day prior to the effective date of the termination. Express Scripts maintains that it no longer trusts that CareMed is suited to maintain the high standards of integrity required of pharmacies in its provider network and that the relationship between Express Scripts and CareMed is over.

**Legal standard**

---

patient's actual clinical information from the prescribing physician and conveying that information.
c. [CareMed] failed to adequately oversee and train staff responsible for the prior authorization process.
d. [CareMed] had inadequate procedures and auditing processes in place to ensure that some claims submitted to certain third-party payors for Rituxan and Procrit, including claims for payment to Part D plans and Medicaid, were reversed when necessary or credited to the Part D plan or Medicaid, after Procrit and Rituxan were returned to the pharmacy and restocked or not delivered to and/or received by the beneficiary.

(Compl. at ¶ 44)

"[T]he basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 506–07 (1959). A district court has broad discretion when ruling on a request for injunction. Novus Franchising, Inc. v. Dawson, 725 F.3d 885, 893 (8th Cir. 2013). In determining whether a preliminary injunction should be issued, a district court must consider: (1) the threat of irreparable harm to the movant, (2) the balance between this harm and the harm to the other party if the injunction is granted, (3) the probability of movant's success on the merits, and (4) the public interest. Dataphase Sys., Inc. v. C.L. Sys., Inc., 640 F.2d 109, 114 (8th Cir.1981). Applications for preliminary injunctions and temporary restraining orders are generally measured against the same factors. See, e.g., Roberts v. Davis, 2011 WL 6217937, at *1 (E.D. Mo. Dec. 14, 2011); Schaefer v. Nixon, 2010 WL 3724848, at *2 n. 2 (E.D. Mo. Sept. 17, 2010).

**Discussion**

**A. Likelihood of success**

In order to be entitled to injunctive relief, CareMed must establish a substantial likelihood of prevailing on the merits of its claims. Anheuser-Busch, Inc. v. VIP Products, LLC, 666 F.Supp.2d 974, 981-82 (E.D.Mo. 2008) (citing Planned Parenthood Minn. v. Rounds, 530 F.3d 724, 732 (8th Cir.2008) (en banc) ("If the party with the burden of proof makes a threshold showing that it is likely to prevail on the merits, the district court should then proceed to weigh the other Dataphase factors."). To succeed on the merits of its claim for wrongful termination of a contract, CareMed must prove it "substantially performed [its] part of the contract up to the time [it] was prevented from doing so" by termination of that contract." Gaines v. Jones, 486 F.2d 39, 52 (8th Cir. 1973).

CareMed alleges that Express Scripts' reasons for terminating the Agreement are pretextual and that its real purpose for terminating the Agreement is to divert thousands of patients from CareMed to Express Scripts' own specialty pharmacy as part of its continuing monopolization of the market. (Compl. at ¶¶ 52, 58) In its memorandum in support of its motion for injunctive relief, CareMed also contends that Express Scripts failed to comply with the dispute resolution procedure required under section 7.12 of their Agreement[2] by terminating CareMed without first engaging in the "Good Faith Discussions" required under the Agreement.

In response, Express Scripts points first to the limiting language of section 7.12 ("except as provided herein") as well as Section 4.2.c of the Agreement which provides for immediate termination without caveat. Next, Express Scripts argues that section 7.12 was not triggered by its notice of termination because such a notice is not a "legal action." Third, Express Scripts asserts that the parties have "met and conferred" on numerous occasions since the initial termination notice was sent on October 24, 2014. Specifically, Express Scripts extended the termination of CareMed several times to give it an opportunity to submit documentation to refute

---

[2] Section 7.12 provides in pertinent part:

Except as provided here in, prior to either party taking any legal action in connection with this Agreement, both parties agree to meet in good faith to resolve any claim or controversy ("Claim") whether under federal or state statutory or common law, brought by either PBM or the Provider against the other, or against the employee, members, agents or assigns of the other, arising from or relating in any way to the interpretation or performance of this Agreement. The aggrieved party shall notify the other party of its Claim including sufficient detail to permit the other party to respond. The parties agree to meet and confer in good faith to resolve any Claims that may arise under this Agreement for a period of not less than thirty (30) days. In the event the parties cannot resolve any Claims pursuant to Good Faith Discussions and the minimum thirty (30) day period has been met, then the aggrieved party may end discussions with the other party by providing written notice to the other party of its intent to cease discussions. Thereafter, the parties may proceed to litigation. Good Faith Discussion and the thirty (30) day notice period do not apply to Claims by either party solely seeking immediate injunctive relief.

Express Scripts' findings. Finally, Express Scripts responds that CareMed has offered no evidence that it did not submit fraudulent claims or that its actions did not violate the Agreement.

At this stage of the proceedings, the Court cannot predict which side is likely to prevail at trial. The fact that Express Scripts' first notice of termination was based on incorrect information gives the impression that Express Scripts was looking for a reason to terminate CareMed from its pharmacy network. At the same time, CareMed cannot deny that as part of the settlement of the False Claims Act action it made admissions that its representatives falsely represented to insurers that they were calling from a physician's office to obtain prior authorization. Those false statements would appear to violate the terms of the Agreement. The Court need not resolve these issues, however, because CareMed has not demonstrated that it is likely to suffer irreparable harm in the absence of injunctive relief.

**B. Irreparable harm**

Regardless of the strength of its claim on the merits, a movant for preliminary injunctive relief must show a threat of irreparable harm. See Dataphase, 640 F.2d at 113 ("The likelihood that plaintiff ultimately will prevail is meaningless in isolation . . . [and] must be examined in the context of the relative injuries to the parties and the public."). Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages. General Motors Corp. v. Harry Brown's, LLC, 563 F.3d 312, 319 (8th Cir. 2009). Irreparable harm must be certain and imminent such that there is a clear and present need for equitable relief. Iowa Utils. Bd. v. F.C.C., 109 F.3d 418, 425 (8th Cir. 1996). Possible or speculative harm is not sufficient. Alternative Medicine and Pharmacy, Inc. v. Express Scripts, Inc., et al., 2014 WL 4988199, at *6 (E.D. Mo. Oct. 7, 2014) (citing Local Union No. 884, United Rubber, Cork, Linoleum, & Plastic Workers of Am. v.

Bridgestone/Firestone, Inc., 61 F.3d 1347, 1355 (8th Cir. 1995)). When there is an adequate remedy at law, a preliminary injunction is not appropriate. Id. (citing Modern Computer Sys., Inc. v. Modern Banking Sys., Inc., 871 F.2d 734, 738 (8th Cir. 1989)).

CareMed argues that the loss of membership in Express Scripts' network will put it out of business. In support of that argument it submits the affidavit of its President, Nuaman Tyyeb. (Doc. No. 6-1) Mr. Tyyeb states that CareMed currently provides services for approximately 7,800 patients in the State of New York suffering from critical or chronic diseases who require medication. Mr. Tyyeb states that the premature termination of the Agreement will severely disrupt the continuity of care these patients receive. He estimates the revenues associated with these patients at $69 million for the period January 1, 2014 through September 30, 2014, representing a "significant portion" of CareMed's business. CareMed contends that the sudden loss of this revenue "almost certainly will cause CareMed to become insolvent and CareMed will be forced to lay off 75 employees immediately." (Doc. No. 6 at 8) Mr. Tyyeb also states that the exclusion of CareMed from Express Scripts' network will result in irreparable reputational harm in the industry of pharmacy benefit managers and loss of customer goodwill. (Id. at 9) In further support of its argument, CareMed submits nineteen (19) testimonials from healthcare providers and patients attesting to CareMed's critical role in providing life-saving medications. (Doc. No. 4-8 at 66-88)

Express Scripts responds that CareMed has provided no evidence of the harm it expects to suffer aside from Mr. Tyyeb's conclusory and self-serving statements. (Doc. No. 12 at 12-14) Moreover, CareMed's alleged injuries are not "irreparable" in the sense that they could be addressed through money damages if CareMed is successful following a trial on the merits. (Id. at 15)

In Alternative Medicine, 2014 WL 4988199, a case cited by Express Scripts which is factually very similar to the instant case, the plaintiff compounding pharmacy sought to enjoin termination from Express Scripts' network. This Court denied the pharmacy's motion for injunctive relief, finding its threat of irreparable harm was "severely limited" by the fact that the provider agreement permitted Express Scripts to terminate it without cause on 90 days' notice. "[A]ny alleged harm resulting from [pharmacy's] termination in Express Scripts' provider network was contemplated by the parties as it results from the express terms of the Provider Agreement, which permits Express Scripts to terminate [pharmacy's] membership even without cause upon 90 days written notice." Id. at *7. In other words, the harm was "purely economic and therefore not irreparable." Id.

Similarly, in Trilogy Health Care, LLC v. Medco Health Solutions, Inc., 2013 WL 4832708 (D.N.J. Sept. 10, 2013), the court denied injunctive relief to a pharmacy seeking reinstatement in defendant's pharmacy network because the pharmacy failed to establish irreparable harm. Under the provider agreement, the defendant had a contractual right to terminate without cause on 30 days' notice, which limited the pharmacy's available injunctive remedy to no more than 60 additional days of membership in network. Id. at *1. The court expressed doubt that "a forced 60-day restoration of pharmacy's provider status" would be of greater benefit to the pharmacy's business than an award of money damages for 60 days of lost profits. Id. at *3.

This case is fundamentally a breach of contract case. The Agreement at issue provides that Express Scripts may terminate the Agreement immediately upon certain circumstances (Doc. No. 4-2 at § 4.2c) and without cause on at least 30 days' written notice. (Doc. No. 4-2 at § 4.2a)

Like the plaintiff pharmacies in <u>Alternative Medicine</u> and <u>Trilogy</u>, CareMed is seeking an injunctive remedy to which it has no entitlement under the Agreement.

CareMed asserts that Express Scripts comprises 40% of its customer base but provides no evidence to support that assertion. CareMed contends that its termination from Express Scripts' network will have a "domino effect with other [pharmacy benefit managers] … leading to the destruction of CareMed's business" (<u>see</u> Tyyeb Aff. at ¶¶ 22, 26), yet again, offers no support that it will suffer such damage from the loss of a portion of its business revenue. Moreover, claims of potential lost customers and revenue are really "claims of lost profits, which can be calculated and fully compensated by an award of money damages." <u>Alternative Medicine</u>, 2014 WL 4988199, at *8. These claims do not constitute irreparable harm sufficient to support the grant of injunctive relief. <u>General Motors</u>, 563 F.3d at 319.

Likewise, CareMed's claim of intangible injuries such as damaged goodwill and reputation is supported by nothing more than general business principles and therefore too speculative to establish irreparable harm. <u>Id</u>. <u>See</u> <u>also</u> <u>Novus Franchising, Inc. v. Dawson</u>, 725 F.3d 885, 895 (8th Cir. 2013) ("In order to demonstrate irreparable harm, a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief … [W]e question whether Novus's alleged injuries, i.e., "a loss of customers or customer goodwill," are truly "irreparable" in the sense that they could not be addressed through money damages if Novus is successful following a trial on the merits.") Moreover, any claim for loss of goodwill or damage to reputation would primarily be attributable to CareMed's own admissions made as part of the settlement of the False Claims Act case.

**C. Remaining Dataphase factors**

Although failure to demonstrate irreparable harm is itself a sufficient ground to deny

injunctive relief, Watkins Inc. v. Lewis, 346 F.3d 841, 844 (8th Cir. 2003), the court should also consider the injury that granting such relief would inflict on the parties to the dispute and other interested parties, including the public. Dataphase, 640 F.2d at 113.

Express Scripts maintains that an injunction of the type CareMed requests would force it to continue doing business with CareMed and harm its ongoing operations and reputation as well as the integrity of its pharmacy provider network. (Doc. No. 12 at 18-19) Like the courts in Alternative Medicine, 2014 WL 4988199 at *8, and Trilogy, 2013 WL 4832708 at *1, this Court doubts that injunctive relief is a "sensible remedy," particularly where, as here, Express Scripts has declared it can no longer trust CareMed. Express Scripts argues that forcing it to continue doing business with CareMed and accepting claims from CareMed will require close monitoring and supervision of CareMed's business practices by the parties, their attorneys, and the Court. It is not the Court's role to police a contractual relationship. See, e.g., Fashion Furniture Co., Inc. v. Ethan Allen, Inc., 561 F.Supp. 78, 82 (E.D. Mo. 1983); Community Title Co. v. Roosevelt Federal Sav. & Loan Ass'n, 670 S.W.2d 895, 904 (Mo.Ct.App. 1984).

Further, CareMed offers no evidence that any members of Express Scripts' clients will be left without medication or access to medication if it is terminated from the network. Express Scripts submits a declaration of Thomas Luft, Senior Director for Provider Contracting and Strategy, as evidence of the efforts it made to notify members of CareMed's termination. (Doc. No. 13) Luft states that Express Scripts followed its internal procedures to ensure that its health plan sponsor clients could timely notify members of CareMed's termination and extended CareMed's participation in network to allow for additional notification of members. (Id. at ¶¶ 29-30) According to Luft, members were generally provided with the names and locations of alternative pharmacies selected based on their geographic proximity to CareMed, or with

instructions concerning how to locate the nearest alternative in-network pharmacy. (Id. at ¶¶ 31, 32)

In summary, the Court has examined the balance of the equities in light of the Dataphase factors and concludes that CareMed has not met its burden of showing that injunctive relief should issue.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction [5] is **DENIED.**

_____
**JOHN A. ROSS
UNITED STATES DISTRICT JUDGE**

Dated this 20th day of January, 2015.